IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, and ARKANSAS DEPARTMENT OF ENERGY & ENVIRONMENT, DIVISION OF ENVIRONMENTAL QUALITY,<br><br>              Plaintiffs,<br><br>        v.<br><br>DOMTAR A.W., LLC,<br>              Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 4:26-cv-04059-JTS |

## COMPLAINT

Plaintiffs, the United States of America, by the authority of the Attorney General and acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and the Arkansas Department of Energy & Environment, Division of Environmental Quality ("DEQ"), file this Complaint and allege the following:

## NATURE OF ACTION

1.     This is a civil action against Domtar, A.W., LLC ("Domtar" or "Defendant"), pursuant to the Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq.*, and the Arkansas Water and Air Pollution Control Act ("AWAPCA") (Ark. Code Ann. § 8-4-301 *et seq.*).

2.     Plaintiff United States seeks civil penalties and injunctive relief under Section 113 of the CAA, 42 U.S.C. § 7413, and based on alleged violations of the CAA and its implementing regulations. Plaintiff DEQ seeks civil penalties and injunctive relief under Ark. Code Ann. § 8-4-103(b) of the AWAPCA based on alleged violations of the AWAPCA and its implementing regulations. The violations alleged in this Complaint arise from operations at Domtar's kraft pulp and paper mill facility located at 285 Highway 71 South in Ashdown, Arkansas ("Domtar Mill").

3. Plaintiffs allege that Domtar has violated and continues to violate the following statutory and regulatory requirements at the Domtar Mill, as set forth in this Complaint:

a. The New Source Performance Standards ("NSPS") Standards of Performance for Kraft Pulp Mills promulgated at 40 C.F.R. Part 60, Subpart BB, pursuant to Section 111 of the CAA, 42 U.S.C. § 7411, and incorporated by reference in Arkansas Pollution Control and Ecology Commission ("APC&EC") Rule Number 26.302(B) ("NSPS Subpart BB");

b. The National Emission Standards for Hazardous Air Pollutants ("NESHAP") for Hazardous Air Pollutants from the Pulp and Paper Industry promulgated at 40 C.F.R. Part 63, Subpart S, pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, and incorporated by reference in APC&EC Rule Number 26.302(C) ("NESHAP Subpart S"); and

c. The NESHAP for Major Sources: Industrial, Commercial, and Institutional Boilers and Process Heaters promulgated at 40 C.F.R. Part 63, Subpart DDDDD, pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, and incorporated by reference in APC&EC Rule Number 26.302(C) ("NESHAP Subpart DDDDD").

**JURISDICTION AND VENUE**

4. This Court has jurisdiction over the United States' CAA claims pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to 28 U.S.C. §§ 1331, 1345, and 1355. This Court has personal jurisdiction over Domtar, which does business in the State of Arkansas and in this judicial district.

5. This Court has supplemental jurisdiction over DEQ's state law claims under Ark. Code Ann. § 8-4-102 *et seq.* pursuant to 28 U.S.C. § 1367 because its claims are so related to the claims in the United States' action that they form part of the same case or controversy.

6. Venue is proper in this District pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b); and 28 U.S.C. §§ 1391(b), (c) and 1395(a), because Domtar conducts business in this District, and the violations that constitute the basis for this Complaint occurred in this District.

## AUTHORITY AND NOTICE

7. The Attorney General of the United States has authority to bring this action on behalf of the Administrator of the EPA under, *inter alia*, 28 U.S.C. §§ 516 and 519, and Section 305 of the CAA, 42 U.S.C. § 7605.

8. DEQ has authority to bring this action pursuant to Ark. Code Ann. §§ 8-4-103(b), 8-4-311(a)(11) and (12), and 8-4-315.

9. Effective September 14, 1981, EPA delegated the authority for implementation and enforcement of the NSPS and NESHAP programs (except for demolition and renovation of buildings containing asbestos) to the Arkansas Department of Pollution Control and Ecology ("ADPCE"). Except as specifically limited, EPA delegated to the ADPCE the authority and responsibilities of the Administrator or the Regional Administrator found in 40 C.F.R. Part 60 and 40 C.F.R. Part 61. *See* 47 Fed. Reg. 7665 (February 22, 1982). In 1997, ADPCE was renamed the Arkansas Department of Environmental Quality. *An Act To Rename And Clarify The Duties Of The Arkansas Department Of Pollution Control & Ecology*, 1997, Ark. Acts 1219 (HB 2229). In 2019, the Arkansas Department of Energy & Environment was created as an umbrella agency with the Arkansas Department of Environmental Quality included under its umbrella, but DEQ retained its original delegated authorities. *Transformation And Efficiencies Act Of 2019*, Ark. Code. Ann., § 25-43-101 *et seq.* (2019). The Arkansas Department of Environmental Quality was renamed the Division of Environmental Quality ("DEQ"). *Id.* Notwithstanding delegation to the State for the NSPS and NESHAP programs, EPA retains authority, concurrent with the State, to enforce the

Civil Complaint                    Page 3 of 32

NSPS and NESHAP programs. *See* Sections 111(c)(2) and 112(l)(7) of the CAA, 42 U.S.C. §§ 7411(c)(2) and 7412(l)(7).

10.    EPA promulgated final approval of the Arkansas Operating Permit Program in 2001. *See* 66 Fed. Reg. 51312 (October 9, 2001). The Operating Permit Program provides that permits issued thereunder will address all applicable CAA requirements and designated State-only requirements within one permit (the Title V Permit). DEQ requested EPA's approval of its mechanism to implement and enforce the NESHAP standards applicable to Title V sources (delegated Part 63 standards) by including such standards in Title V permits when they are issued or updated. In November 2014, EPA issued final approval of DEQ's request, effective January 12, 2015. *See* 79 Fed. Reg. 67073 (November 12, 2014).

11.    The Arkansas regulations of relevance to this Complaint incorporate by reference certain of the federal NSPS and NESHAP regulations. Where that is the case, this Complaint provides citations to the federal regulations to reference both the NSPS and NESHAP regulations and the Arkansas regulations.

12.    DEQ authorized Domtar to operate at the time of the alleged violations under a Title V operating permit, Permit No. 0287-AOP-R21, issued on December 28, 2018. Domtar's current authority to operate is under a Title V operating permit, Permit No. 0287-AOP-R23, issued by DEQ on April 15, 2020. Under both permits, Domtar must operate in compliance with the NSPS and NESHAP program regulations, which are referenced in Domtar's permit.

13.    Notice has been given to Domtar and to DEQ, the appropriate air pollution control agency in the state of Arkansas, as required by Section 113(b) of the CAA, 42 U.S.C. § 7413. DEQ is also a co-Plaintiff.

**<u>DEFENDANT</u>**

14.    Domtar is a Delaware limited liability company.

Civil Complaint                     Page 4 of 32

15. At all times pertinent to this suit, Domtar is the "owner or operator" of the Domtar Mill, as that term is defined in Sections 111(a)(5) and 112(a)(9) of the CAA, 42 U.S.C. §§ 7411(a)(5) and 7412(a)(9).

16. Domtar is a "person" as defined in Sections 113(b) and 302(e) of the CAA, 42 U.S.C. §§ 7413(b) and 7602(e), and applicable federal and state regulations promulgated pursuant to the CAA.

## STATUTORY AND REGULATORY BACKGROUND

17. One of the purposes of the CAA is "to protect and enhance the quality of the nation's air resources so as to promote the public health and welfare and the productive capacity of its population[.]" 42 U.S.C. § 7401(b)(1).

### A. PART 60 NEW SOURCE PERFORMANCE STANDARDS

#### 1. General

18. Section 111(b) of the CAA, 42 U.S.C. § 7411(b), authorizes EPA to promulgate standards of performance applicable to "new sources" within categories of sources that cause "air pollution which may reasonably be anticipated to endanger public health or welfare." These regulations are the NSPS.

19. A "new source" is any stationary source, the construction or modification of which is commenced after the promulgation of the standards of performance that will apply to such source. 42 U.S.C. § 7411(a)(2).

20. A "stationary source" is a building, structure, facility, or installation that emits or may emit any air pollutant. 42 U.S.C. § 7411(a)(3).

21. In 1978, EPA listed "Kraft Pulp Mills" as a source category that contributes significantly to air pollution.

22. It is unlawful for owners or operators of any new source to operate in violation of the NSPS after the effective date of the standards. 42 U.S.C. § 7411(e).

23. An "owner or operator" means "any person who owns, leases, operates, controls, or supervises a stationary source." 42 U.S.C. § 7411(a)(5).

24. The NSPS are codified at 40 C.F.R. Part 60 of the Code of Federal Regulations.

**2. NSPS Subpart BB:  Standards of Performance for Kraft Pulp Mills**

25. NSPS Subpart BB sets forth standards of performance for kraft pulp mills. 40 C.F.R. §§ 60.280–60.285.

26. NSPS Subpart BB applies to affected facilities in kraft pulp mills. Brown stock washer systems are included in the regulatory list of affected facilities at kraft pulp mills. 40 C.F.R. § 60.280(a).

27. Any facility under 40 C.F.R. § 60.280(a) that commences construction, reconstruction, or modification after September 24, 1976, and on or before May 23, 2013, is subject to the requirements of NSPS Subpart BB. 40 C.F.R. § 60.280(b).

28. "Affected facility" means "any apparatus to which a standard is applicable." 40 C.F.R. § 60.2.

29. A "kraft pulp mill" means "any stationary source that produces pulp from wood by cooking (digesting) wood chips in a water solution of sodium hydroxide and sodium sulfide (white liquor) at high temperature and pressure." 40 C.F.R. § 60.281(a). Regeneration of the cooking chemicals through a recovery process is also considered part of the kraft pulp mill. 40 C.F.R. § 60.281(a).

30. "Brown stock washer system" means "brown stock washers and associated knotters, vacuum pumps, and filtrate tanks used to wash the pulp following the digester system." 40 C.F.R. § 60.281(e).

Civil Complaint                         Page 6 of 32

### 3. NSPS Subpart BB: Standards for Total Reduced Sulfur

31.    No owner or operator, subject to the provisions of NSPS Subpart BB, may cause to be discharged into the atmosphere from any brown stock washer system any gases which contain total reduced sulfur ("TRS") in excess of five parts per million ("ppm") by volume on a dry basis, uncorrected for oxygen content. 40 C.F.R. § 60.283(a)(1).

32.    "TRS" is measured by "the sum of the sulfur compounds hydrogen sulfide, methyl mercaptan, dimethyl sulfide, and dimethyl disulfide, that are released during the kraft pulping operation and measured by Method 16." 40 C.F.R. § 60.281(c).

### B. PART 63: NATIONAL EMISSION STANDARDS FOR HAZARDOUS AIR POLLUTANTS

33.    Section 112 of the CAA sets forth a national program for the control of hazardous air pollutants ("HAPs"). 42 U.S.C. § 7412. As originally promulgated in the Clean Air Act Amendments of 1970, Section 112 directed EPA to publish a list of HAPs. A HAP was defined as "an air pollutant to which no ambient air quality standard is applicable and which in the judgment of the Administrator may cause, or contribute to, an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness." 42 U.S.C. § 7412(a)(1) (1990). At that time, Congress directed EPA to establish HAP standards that provided "an ample margin of safety to protect the public health from such hazardous air pollutant." 42 U.S.C. § 7412(b)(1)(B) (1990). Between 1970 and 1990, EPA listed eight substances as HAPs and promulgated emission standards for seven of them. H.R. Rep. No. 101-490, 101st Cong., 2d Sess., pt. 1 at 151 (1990).

34.    Through the 1990 amendments to the CAA, Congress established a new program for the control of HAPs with an initial list of 188 HAPs believed to cause adverse health or environmental effects. Section 112(b)(1) of the CAA, 42 U.S.C. § 7412(b)(1). H.R. Rep. No. 101-

490, 101st Cong., 2d Sess., pt. 1 at 324 (1990). The regulations promulgated prior to 1990 under the original Section 112 remained in full force and effect.

35. Congress directed EPA to publish a list of all categories and subcategories of, *inter alia*, major sources of HAPs. 42 U.S.C. § 7412(c).

36. "Major source" was and is defined as any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, ten tons per year or more of any HAP or twenty-five tons per year or more of any combination of HAPs. 42 U.S.C. § 7412(a)(1); *see* 40 § C.F.R. 63.2.

37. "Stationary source" was and is defined as "any building, structure, facility, or installation which emits or may emit any air pollutant." 42 U.S.C. §§ 7411(a)(3) and 7412(a)(3).

38. A "category" of sources is a group of sources having some common features suggesting that they should be regulated in the same way and on the same schedule. 57 Fed. Reg. 31576, 31578 (July 16, 1992). A single stationary source can include multiple source categories. *Id.*

39. Congress directed EPA to promulgate regulations establishing emission standards for each category or subcategory of, *inter alia*, major sources of HAPs. 42 U.S.C. § 7412(d)(1). These emission standards must require the maximum degree of reduction in emissions of HAPs that the Administrator—considering the cost of achieving such emission reduction and any non-air quality health and environmental impacts and energy requirements—determines is achievable for the new or existing sources in the category or subcategory to which the emission standard applies. 42 U.S.C. § 7412(d)(2).

40.     To the extent that it is not feasible to prescribe or enforce an emission standard for the control of a HAP, Congress authorized EPA to promulgate "design, equipment, work practice, or operational" standards, which are to be treated as emission standards. 42 U.S.C. § 7412(h).

41.     The emission standards promulgated under Section 112 of the 1990 Amendments of the CAA, 42 U.S.C. § 7412, are known as the NESHAP for Source Categories or "maximum achievable control technology" ("MACT") standards. These emission standards are codified at 40 C.F.R. Part 63.

42.     After the effective date of any emission standard, limitation, or regulation promulgated pursuant to Section 112 of the CAA, no person may operate a source in violation of such standard, limitation, or regulation. 42 U.S.C. § 7412(i)(3).

### 1.     NESHAP Subpart A: General Provisions

43.     Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412 (as it existed after the 1990 CAA Amendments) EPA promulgated regulations that contain general provisions applicable to sources that are subject to the MACT standards of Part 63 of Title 40 of the Code of Federal Regulations. 40 C.F.R. Part 63, Subpart A, §§ 63.1–63.16 ("NESHAP Subpart A").

44.     NESHAP Subpart A states that the provisions of 40 C.F.R. Part 63 "apply to the owner or operator of any stationary source that (i) [e]mits or has the potential to emit any hazardous air pollutant listed in or pursuant to Section 112(b) of the Act; and (ii) [i]s subject to any standard, limitation, prohibition, or other federally enforceable requirement established pursuant to this part." 40 C.F.R. § 63.1(b).

45.     An "owner or operator" means any person who owns, leases, operates, controls, or supervises a stationary source. 40 C.F.R. § 63.2.

46.     A "stationary source" means any building, structure, facility, or installation which emits or may emit any air pollutant. 40 C.F.R. § 63.2.

Civil Complaint                    Page 9 of 32

47.     No owner or operator, subject to NESHAP, may operate any affected source in violation of the requirements of NESHAP. The affected source is not in violation of NESHAP requirements when it is subject to and in compliance with either an extension of compliance or exemption from compliance as provided for in 40 C.F.R. § 63.4(a).

48.     An "affected source" for the purposes of NESHAP means a collection of equipment, activities, or both within a single contiguous area and under common control that is included in a CAA Section 112(c) source category (42 U.S.C. § 7412(c)) or subcategory for which a CAA Section 112(d) standard (42 U.S.C. § 7412(d)) or other relevant standard is established pursuant to Section 112 of the CAA. 40 C.F.R. § 63.2.

**2.     NESHAP Subpart S: National Emission Standards for Hazardous Air Pollutants from the Pulp and Paper Industry**

**i.     General Provisions**

49.     Within 40 C.F.R. Part 63, Subpart S, EPA promulgated specific regulations applicable to the owner or operator of kraft processes using wood that produce pulp, paper, or paperboard that are located at a plant site that is a major source as defined in 40 C.F.R. § 63.2 of NESHAP Subpart A. 40 C.F.R. § 63.440(a)(1).

50.     NESHAP Subpart S applies to a CAA Section 112(c) source category (42 U.S.C. § 7412(c)) or subcategory and is a CAA Section 112(d) standard (42 U.S.C. § 7412(d)) or other relevant standard that was established pursuant to Section 112 of the CAA.

51.     For plants that use kraft, soda, sulfite, or semi-chemical pulping processes using wood, the existing "affected source" is the total of all HAP emission points in the pulping and bleaching systems. 40 C.F.R. § 63.440(b)(1).

52.     "HAP," for purposes of NESHAP Subpart S, means a hazardous air pollutant, which is any air pollutant listed in or pursuant to Section 112(b) of the CAA. 40 C.F.R. §§ 63.441 and 63.2.

53.     "Emission point," for purposes of Subpart S, "means any part of a stationary source that emits hazardous air pollutants regulated under [Subpart S], including emissions from individual process vents, stacks, open pieces of process equipment, equipment leaks, wastewater and condensate collection and treatment system units, and those emissions that could reasonably be conveyed through a stack, chimney, or duct where such emissions first reach the environment." 40 C.F.R. § 63.441.

54.     Of relevance to the Complaint, NESHAP Subpart S includes standards for pulping systems at kraft processes (40 C.F.R. § 63.443), bleaching systems (40 C.F.R. § 63.445), kraft pulping process condensates (40 C.F.R. § 63.446), and enclosures and closed-vent systems (40 C.F.R. § 63.450).

### ii.     Section 63.443: Standards for the Pulping System

55.     The owner or operator of each pulping system using the kraft process subject to NESHAP Subpart S must control the total HAP emissions as specified in 40 C.F.R. § 63.443(c) and (d) from specified equipment systems, including each pulp washing system. 40 C.F.R. § 63.443(a)(1)(iii).

56.     "Pulping system" means "all process equipment, beginning with the digester system, and up to and including the last piece of pulp-conditioning equipment before the bleaching system, including treatment with ozone, oxygen, or peroxide before the first application of a chemical bleaching agent intended to brighten pulp. The pulping system includes pulping process condensates and can include multiple pulping lines." 40 C.F.R. § 63.441.

57.    "Pulp washing system" means "all equipment used to wash pulp and separate spent cooking chemicals following the digester system and prior to the bleaching system, oxygen delignification system, or paper machine system (at unbleached mills). The pulp washing system equipment includes vacuum drum washers, diffusion washers, rotary pressure washers, horizontal belt filters, intermediate stock chests, and their associated vacuum pumps, filtrate tanks, foam breakers or tanks, and any other equipment serving the same function" as the equipment listed above. 40 C.F.R. § 63.441.

58.    "Pulping process condensates" means "any HAP-containing liquid that results from contact of water with organic compounds in the pulping process," including low volume, high concentration ("LVHC") system condensates and high volume, low concentration ("HVLC") system condensates. 40 C.F.R. § 63.441.

59.    "LVHC system" means the collection of equipment including the digester, turpentine recovery, evaporator, steam stripper systems, and any other equipment serving the same function as the equipment listed above. 40 C.F.R. § 63.441.

60.    "LVHC collection system" means "the gas collection and transport system used to convey gases from the LVHC system to a control device." 40 C.F.R. § 63.441.

61.    "HVLC system" means the collection of equipment including the pulp washing system, knotter, screen, decker, and oxygen delignification systems, weak liquor storage tanks, and any other equipment serving the same function as the equipment listed above. 40 C.F.R. § 63.441.

62.    "HVLC collection system" means "the gas collection and transport system used to convey gases from the HVLC system to a control device." 40 C.F.R. § 63.441.

63.    Section 63.443(c) of NESHAP Subpart S requires that specified equipment systems, including each pulp washing system, be enclosed, vented into a closed-vent system, and routed to a control device that meets specified requirements. 40 C.F.R. § 63.443(c). Section 63.443(c) also requires that the enclosures and closed-vent system must meet the requirements specified in 40 C.F.R. § 63.450. 40 C.F.R. § 63.443(c).

64.    "Closed-vent system" means "a system that is not open to the atmosphere and is composed of piping, ductwork, connections, and, if necessary, flow-inducing devices that transport gas or vapor from an emission point to a control device." 40 C.F.R. § 63.441.

### iii.    Section 63.445: Standards for the Bleaching System

65.    The owner or operator of bleaching systems bleaching pulp from kraft pulping processes that use any chlorinated compounds must meet all provisions of the 40 C.F.R. § 63.445. 40 C.F.R. § 63.445(a)(2).

66.    "Bleaching system" means "all process equipment after high-density pulp storage prior to the first application of oxidizing chemicals or reducing chemicals following the pulping system, up to and including the final bleaching stage." 40 C.F.R. § 63.441.

67.    The equipment at each bleaching stage of the bleaching systems listed in 40 C.F.R. § 63.445(a), where chlorinated compounds are introduced, must be enclosed, vented into a closed-vent system, and routed to a control device that meets the requirements specified in 40 C.F.R. § 63.445(c). 40 C.F.R. § 63.445(b). Section 63.445(b) of NESHAP Subpart S also requires that the enclosures and closed-vent system meet the requirements specified in 40 C.F.R. § 63.450. 40 C.F.R. § 63.445(b).

#### iv.    Section 63.446: Standards for Kraft Pulping Process Condensates

68.    The owner or operator of kraft processes subject to NESHAP Subpart S must comply with requirements applicable to kraft pulping process condensates. 40 C.F.R. § 63.446(a).

69.    NESHAP Subpart S subjects pulping process condensates from specified equipment systems, including HVLC collection systems and LVHC collection systems, to specified requirements, including 40 C.F.R. § 63.446(d). 40 C.F.R. § 63.446(b)(1)–(5).

70.    Section 63.446(d) of NESHAP Subpart S states that such pulping process condensates shall be conveyed in a closed collection system that is designed and operated to meet specified requirements. 40 C.F.R. § 63.446(b) and (d).

#### v.    Section 63.450: Standards for Enclosures and Closed-Vent Systems

71.    Each enclosure and closed-vent system required by specified provisions, including 40 C.F.R. § 63.443(c) (enclosures and closed-vent systems in kraft pulping systems) and 40 C.F.R. § 63.445(b) (enclosures and closed-vent systems in bleaching systems), must comply with specified requirements, including 40 C.F.R. § 63.450(b) and (d). 40 C.F.R. § 63.450(a).

72.    Section 63.450(b) of NESHAP Subpart S states that each enclosure shall maintain negative pressure at each enclosure or hood opening and that each enclosure or hood opening closed during the initial performance test shall be maintained in the same closed and sealed position at all times except when necessary to use the opening for specified purposes. 40 C.F.R. § 63.450(b).

73.    Section 63.450(d) of NESHAP Subpart S applies to each bypass line in the closed-vent system that could divert vent streams containing HAP to the atmosphere without meeting applicable emission limitations and requires that the owner or operator must comply with specified requirements including 40 C.F.R. § 63.450(d)(2). 40 C.F.R. § 63.450(d).

74.    Section 63.450(d)(2) of NESHAP Subpart S applies to bypass line valves that are not computer controlled and requires the owner or operator to maintain such valves in a closed position and to place a seal on the valve or closure mechanism that meets applicable requirements. 40 C.F.R. § 63.450(d)(2).

**vi.    Section 63.453: Monitoring Requirements**

75.    NESHAP Subpart S sets forth monitoring requirements. 40 C.F.R. § 63.453.

76.    Monitoring requirements in 40 C.F.R. § 63.453(k) apply to each enclosure and closed-vent system used to comply with 40 C.F.R. § 63.450(a). 40 C.F.R. § 63.453(k).

77.    Section 63.453(k)(1) of NESHAP Subpart S requires, for each enclosure opening, performance of a visual inspection of the closure mechanism specified in 40 C.F.R. § 63.450(b) at least once every thirty days to ensure the opening is maintained in the closed position and sealed. 40 C.F.R. § 63.453(k)(1).

78.    Section 63.453(k)(2) of NESHAP Subpart S requires visual inspection of each closed-vent system required by 40 C.F.R. § 63.450(a) every thirty days and at other times as requested by the Administrator, and the visual inspection must include inspection of ductwork, piping, enclosures, and connections to covers for visible evidence of defects. 40 C.F.R. § 63.453(k)(2).

79.    Section 63.453(k)(5) of NESHAP Subpart S requires visual inspection of the valve or closure mechanism specified in 40 C.F.R. § 63.450(d)(2) at least once every thirty days to ensure that the valve is maintained in the closed position and the emission point gas stream is not diverted through the bypass line. 40 C.F.R. § 63.453(k)(5).

80.    Section 63.453(*l*) of NESHAP Subpart S requires visual inspection of each pulping process condensate closed collection system used to comply with 40 C.F.R. § 63.446(d) every thirty days via specified monitoring requirements. 40 C.F.R. § 63.453(*l*).

Civil Complaint                Page 15 of 32

**3.    NESHAP Subpart DDDDD: National Emission Standards for Hazardous Air Pollutants for Major Sources: Industrial, Commercial, and Institutional Boilers and Process Heater**

81.    Within 40 C.F.R. Part 63, Subpart DDDDD, EPA promulgated regulations to establish national emission limitations and work practice standards for HAPs emitted from industrial, commercial, and institutional boilers and process heaters located at major sources of HAPs. 40 C.F.R. § 63.7480. These regulations also establish requirements to demonstrate initial and continuous compliance with the emission limitations and work practice standards and apply to owners or operators of an industrial, commercial, or institutional boiler or process heater, as defined in 40 C.F.R. § 63.7575, that is located at, or is part of, a major source of HAPs, except as specified in 40 C.F.R. § 63.7491. 40 C.F.R. § 63.7485.

82.    A "major source" of HAPs, of relevance to this Complaint and for the purposes of NESHAP Subpart DDDDD, is as defined in 40 C.F.R. § 63.2.

83.    Subpart DDDDD regulations apply to new, reconstructed, and existing "affected sources." An "affected source" is comprised of (1) the collection at a major source of all existing industrial, commercial, and institutional boilers and process heaters within a subcategory, as defined in 40 C.F.R. § 63.7575 or (2) each new or reconstructed industrial, commercial, or institutional boiler or process heater, as defined in 40 C.F.R. § 63.7575, located at a major source. 40 C.F.R. § 63.7490.

84.    "Boiler" means "an enclosed device using controlled flame combustion and having the primary purpose of recovering thermal energy in the form of steam or hot water. Controlled flame combustion refers to a steady-state, or near steady-state, process wherein fuel and/or oxidizer feed rates are controlled." 40 C.F.R. § 63.7575. There are subcategories of boilers, including units designed to burn biomass or bio-based solids and coal or fossil fuel. *See* 40 C.F.R. § 63.7499.

Civil Complaint                    Page 16 of 32

85.     A boiler or process heater is "new" if construction of the boiler or process heater commenced after June 4, 2010, and meets the applicability criteria at the time construction commenced. 40 C.F.R. § 63.7490(b).

86.     A boiler or process heater is "reconstructed" if it meets the reconstruction criteria as defined in 40 C.F.R. § 63.2, reconstruction commenced after June 4, 2010, and the applicability criteria is met when reconstruction commenced. 40 C.F.R. § 63.7490(c).

87.     A boiler or process heater is "existing" if it is not new or reconstructed. 40 C.F.R. § 63.7490(d).

88.     Existing boilers or process heaters must have complied with NESHAP Subpart DDDDD no later than January 31, 2016, unless EPA grants the owner or operator an extension of compliance under 40 C.F.R. § 63.6(i). 40 C.F.R. § 63.7495(b).

89.     Owners and operators of boilers or process heaters, as described in 40 C.F.R. § 63.7485, must conduct initial performance tests and fuel analyses to establish operating limits, in accordance with 40 C.F.R. §§ 63.7520 (b) and (c) and Tables 5 and 7. 40 C.F.R. § 63.7530(a).

90.     Owners and operators must also submit a "Notification of Compliance Status" containing the results of the initial compliance demonstration, following the requirements in 40 C.F.R. § 63.7545(e). 40 C.F.R. § 63.7530(f).

91.     The Notification of Compliance Status is a notification to EPA that provides information about whether the source has complied with the relevant standard, per the requirements of 40 C.F.R. § 63.9(h). *See* 40 C.F.R. §§ 63.9(h), 63.7545.

92.     The owner or operator must submit the Notification of Compliance Status before the close of business on the sixtieth day after completing all performance test and/or other initial compliance demonstrations for all boiler or process heaters at the facility according to 40 C.F.R.

§ 63.10(d)(2) (the record keeping and reporting requirements for performance test results under NESHAP). The Notification of Compliance Status report must contain all the applicable information specified in 40 C.F.R. §§ 63.7545(e)(1)–(8). This includes a summary of the results of all performance tests and fuel analyses, and calculations conducted to demonstrate initial compliance including all established operating limits. 40 C.F.R. § 63.7545(e)(2).

93.     The owner or operator's submission of the Notification of Compliance Status begins the compliance dialogue between the Administrator and the owner or operator, so that the Administrator can determine whether the owner or operator is in compliance with NESHAP Subpart DDDDD.

94.     The owner or operator of a boiler or process heater must (1) establish each site-specific operating limit in Table 4 of NESHAP Subpart DDDDD and (2) conduct fuel analyses, in accordance with the requirements set by 40 C.F.R. § 63.7530(b). The analysis includes establishing (1) the maximum chlorine fuel input during the initial fuel analysis according to the procedures in 40 C.F.R. §§ 63.7530(b)(1)(i)–(iii) and (2) the maximum mercury fuel input level during the initial fuel analysis using the procedures in 40 C.F.R. §§ 63.7530(b)(2)(i)–(iii).

95.     Sections 63.7530(b) and (c) of NESHAP Subpart DDDDD detail how to calculate the applicable emission limit through performance stack testing and fuel analysis, respectively. The regulation includes the equation for establishing the maximum chlorine input level (Equation 7) and the equation for establishing a maximum mercury input level (Equation 8). 40 C.F.R. § 63.7530(b) and (c).

96.     Owners or operators of a unit, which are subject to emission limits in Table 1 or 2 or Tables 11 through 15 of NESHAP Subpart DDDDD, must meet the work practice standard according to Table 3 of Subpart DDDDD. 40 C.F.R. § 63.7530(h).

Civil Complaint                    Page 18 of 32

C.    **ENFORCEMENT OF THE CLEAN AIR ACT**

97.    Section 113 of the CAA, 42 U.S.C. § 7413, authorizes EPA to commence a civil action for injunctive relief or civil penalties against any person who has violated any requirement or prohibition of the CAA or regulations promulgated thereunder.

98.    Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes the Court to enjoin a violation, to require compliance, to assess and recover a civil penalty, and to award any other appropriate relief for each violation.

99.    The Administrator is authorized under CAA Section 113(b), 42 U.S.C. § 7413(b), as amended by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note, the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701 note, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 114-74 § 701, 129 Stat. 584, 599-60, and as provided in 40 C.F.R. Part 19, to initiate a judicial enforcement action subject to injunctive relief, mitigation of excess emissions, and civil penalties of up to $124,426 per day for each violation occurring after November 2, 2015, where penalties are assessed on or after January 8, 2025.

100.    Ark. Code Ann. § 8-4-103(b) authorizes DEQ to institute a civil action in any court of competent jurisdiction to accomplish any of the following: restrain any violation or compel compliance with any provision of the AWAPCA or of any rules, regulations, orders, permits, or plans issued pursuant to the AWAPCA; order that remedial measures be taken; recover all costs, expenses, and damages to the DEQ; assess civil penalties in an amount not to exceed ten thousand dollars per day for violations of the AWAPCA or APC&EC rules, regulations, plans, or permits; or recover civil penalties assessed pursuant to subsection (c).

Civil Complaint                        Page 19 of 32

## GENERAL ALLEGATIONS

101.    Unless otherwise specified, the allegations set forth below pertain to all time periods relevant to the Complaint.

102.    Domtar is a person who owns, leases, operates, controls, or supervises the Domtar Mill.

103.    Domtar is the owner or operator of processes that produce paper, including kraft processes to produce pulp, paper, or paperboard using wood, located at the Domtar Mill, pursuant to 42 U.S.C. § 7411(a)(3) and 40 C.F.R. § 63.2.

### 1.    The Domtar Mill

104.    The Domtar Mill is a stationary source within the meaning of the CAA and the NSPS and NESHAP programs and regulations.

105.    The Domtar Mill is a building, structure, facility, or installation that emits or has the potential to emit air pollutants, including hazardous air pollutants listed in or pursuant to Section 112(b) of the Act. The Domtar Mill is subject to a standard, limitation, prohibition, or other federally enforceable requirement established pursuant to the NESHAP regulations, as defined by 40 C.F.R. § 63.2.

106.    Specifically, the Domtar Mill is a stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, ten tons per year or more of any HAP or twenty-five tons per year or more of any combination of HAPs.

107.    The HAPs that the Domtar Mill emits or has the potential to emit include (1) volatile organic compounds ("VOCs"); (2) methanol; and (3) chlorinated compounds, including chlorine dioxide and hydrochloric acid.

Civil Complaint                              Page 20 of 32

108.    The Domtar Mill is a major source within the meaning of Section 112(b) of the CAA, 42 U.S.C. § 7412(b) and the AWAPCA, as defined in 40 C.F.R. § 63.2 of Subpart A.

109.    The Domtar Mill has three parallel pulp lines (No. 1A, No. 1B, and No. 2) which process either hardwood or softwood.

### i.    Applicability of NSPS Subpart BB to the Domtar Mill

110.    The Domtar Mill is a new source within the meaning of the CAA and the NSPS programs and regulations.

111.    The Domtar Mill is a kraft pulp mill within the meaning of the NSPS program and regulations.

### ii.    The Domtar Mill Brown Stock Washing System

112.    The Domtar Mill pulp lines use a series of digesters that use white liquor in the kraft pulping process to digest or cook hardwood or softwood chips into pulp, also known as brown stock.

113.    For pulp line No. 1B, the spent cooking chemicals are washed from the brown stock in a brown stock washer system, commercially known as the "Chemi-Washer."

114.    The Chemi-Washer contains gases that include concentrations of TRS during the kraft pulping operation.

### iii.    Applicability of NESHAP Subpart S to the Domtar Mill

115.    As the owner or operator of the Domtar Mill, Domtar is subject to the requirements of NESHAP Subpart S.

116.    The Domtar Mill is a collection of equipment, activities, or both within a single contiguous area and under common control, within the meaning of 40 C.F.R. § 63.2.

Civil Complaint                Page 21 of 32

117. As a facility that uses wood for kraft pulping processes, the existing affected source at the Domtar Mill is the total of all HAP emission points in the pulping and bleaching systems. 40 C.F.R. § 63.440(b)(1).

118. Domtar must not operate any affected source in violation of an applicable NESHAP provision, unless the affected source is subject to and in compliance with either an extension of compliance or exemption from compliance, as provided for in 40 C.F.R. § 63.4(a).

### (a)    The Pulping System at the Domtar Mill

119. The Domtar Mill has a pulping system, which includes pulping lines that use a series of digesters that lead up to the bleaching system.

120. Domtar owns or operates a pulping system at the Domtar Mill that is subject to the requirements of NESHAP Subpart S.

121. The equipment systems in the Domtar Mill pulping system that are regulated by 40 C.F.R. § 63.443(a) must be enclosed and vented into a closed-vent system that complies with the requirements of 40 C.F.R. § 63.450. *See* 40 C.F.R. § 63.443(c).

122. The Domtar Mill pulping systems have equipment systems, pursuant to 40 C.F.R. § 63.443(a), that are enclosed and vented into closed-vent systems.

### (b)    The Bleaching System at the Domtar Mill

123. Following the pulp washing system, Domtar Mill has a bleaching system that bleaches pulp from kraft pulping processes that use chlorinated compounds.

124. Domtar owns or operates bleaching systems at the Domtar Mill that are subject to the requirements of NESHAP Subpart S.

Civil Complaint                    Page 22 of 32

125.    Domtar must enclose and vent the equipment at each bleaching stage specified in 40 C.F.R. § 63.445(a) into a closed-vent system that complies with the requirements of 40 C.F.R. § 63.450. *See* 40 C.F.R. § 63.445(b).

126.    For the Domtar Mill bleaching system, there is a closed-vent system at each stage where chlorinated compounds are introduced.

### (c)    Pulping Process Condensates

127.    The Domtar Mill has a pulp washing process that generates pulping process condensates, which include HVLC and LVHC gases.

128.    Domtar owns or operates kraft processes at the Domtar Mill that are subject to the requirements of NESHAP Subpart S.

129.    The Domtar Mill's pulping process condensates from equipment systems specified in 40 C.F.R. § 63.446(b) are subject to the requirements of 40 C.F.R. § 63.446(d).

130.    Domtar must convey these pulping process condensates in a closed collection system that meets the requirements of 40 C.F.R. § 63.446(d).

131.    Pulping process condensates from equipment at the Domtar Mill, specified in 40 C.F.R. § 63.446(b), are conveyed in a closed collection system.

### iv.    Applicability of NESHAP Subpart DDDDD to the Domtar Mill

132.    The Domtar Mill includes the No. 2 Power Boiler and the No. 3 Power Boiler, which are "boilers" as defined in 40 C.F.R. § 63.7575.

133.    The Power Boiler No. 2, installed in 1975, is in the subcategory of hybrid suspension grate units designed to burn wet biomass/bio-based solids, gas, biomass, coal, and tire derived fuel. 40 C.F.R. §§ 63.7575, 63.7499.

134.    Domtar uses Power Boiler No. 2 to control emissions from Line No. 2.

Civil Complaint                    Page 23 of 32

135.    Power Boiler No. 3, converted to a power boiler in 1990, is in the subcategory for hybrid suspension grate units designed to burn biomass/bio-based solids, bark, woodchips, gas, and tire derived fuel. 40 C.F.R. §§ 63.7575, 63.7499.

### 2.    The 2019 Inspection

136.    An EPA inspector began an on-site inspection at the Domtar Mill (the "Inspection") on Monday, April 29, 2019.

137.    EPA and DEQ inspectors (collectively, "the Inspection Team") jointly inspected the Domtar Mill from Tuesday, April 30, 2019, to Thursday, May 2, 2019.

138.    On April 30, 2019, the Inspection Team received a tour of the Domtar Mill. As part of the tour, the Inspection Team observed pulp line No. 1B, including the Chemi-Washer.

139.    At the time the Inspection Team was observing pulp line No. 1B, there were visible emissions from the Chemi-Washer.

140.    While the Inspection Team was next to the Chemi-Washer, the personal hydrogen sulfide monitors worn by two members of the Inspection Team, Dr. Sarah Frey of EPA and Mr. Alex Mathis of DEQ, sounded alarms with maximum readings of seven ppm hydrogen sulfide and nine ppm hydrogen sulfide, respectively.

141.    The visible emissions from the Chemi-Washer are indicative of Chemi-Washer discharging gases into the atmosphere.

142.    The concentration of TRS in the gases discharged from the Chemi-Washer on April 30, 2019, was more than five ppm.

143.    At the Inspection, Domtar provided records to the EPA inspector about the Domtar Mill's leak detection and repair monitoring plans, which included records about the visual inspection of the Domtar Mill, and records related to the power boilers.

144. At the time of the Inspection, Domtar did not have an alternative monitoring frequency to complete the visual inspections more or less than every thirty days.

## CLEAN AIR ACT CLAIMS

### A.    PART 60 NSPS VIOLATIONS

#### 1.    CLEAN AIR ACT CLAIM 1: Violation of NSPS Subpart BB

145. Plaintiffs reallege and incorporate by reference Paragraphs 1–32 and 97–104, 110–114, and 136–144 as if fully set forth herein.

146. The Domtar Mill is a facility that commenced construction, reconstruction, or modification after September 24, 1976, and on or before May 23, 2013, and is therefore subject to the requirements of NSPS Subpart BB.

147. Domtar Mill's brown stock washer, also commercially known as a Chemi-Washer, is an "affected facility" subject to the NSPS Subpart BB because the washer was constructed or modified between September 24, 1976, and May 23, 2013.

148. Domtar must not cause the discharge of any gases that contain TRS in excess of five ppm by volume on a dry basis, corrected to ten percent oxygen into the atmosphere from any brown stock washer system, pursuant to 40 C.F.R. § 60.283(a)(1).

149. Subject to a reasonable opportunity for further investigation or discovery, Domtar's Chemi-Washer discharges gases containing TRS in excess of five ppm.

150. The acts or omissions identified in this Claim constitute violations of Section 111 of the CAA, 42 U.S.C. § 7411, the implementing regulation of Section 111 at 40 C.F.R. § 60.283(a)(1), and Ark. Code Ann. § 8-4-301 *et seq*.

151. Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and Ark. Code Ann. § 8-4-103(b), Domtar is liable to the United States and DEQ for injunctive relief and civil penalties for each day of each violation.

### B.    PART 63 NESHAP VIOLATIONS

#### 1.    CLEAN AIR ACT CLAIM 2: Violation of NESHAP Subpart S Monitoring Requirements

152.    Plaintiffs reallege and incorporate by reference Paragraphs 1–16, 33–80, 97–109, 115–131, 136–137, 143–144 as if fully set forth herein.

153.    The enclosures and closed-vent systems required by 40 C.F.R. §§ 63.443(c) (pulping systems) and 63.445(b) (bleaching systems) at the Domtar Mill are subject to the requirements of 40 C.F.R. § 63.450(b) and (d). 40 C.F.R. § 63.450(a).

154.    Domtar must visually inspect each enclosure opening, specified in 40 C.F.R. § 63.450(b), at least once every thirty days, pursuant to 40 C.F.R. § 63.453(k)(1).

155.    Domtar must visually inspect each closed-vent system, required by 40 C.F.R. § 63.450(a), every thirty days and at other times requested by the Administrator, and the visual inspection must include inspection of ductwork, piping, enclosures, and connections to covers for visible evidence of defects, pursuant to 40 C.F.R. § 63.453(k)(2).

156.    Domtar must inspect each valve or closure mechanism, specified in 40 C.F.R. § 63.450(d)(2), at least once every thirty days, pursuant to 40 C.F.R. § 63.453(k)(5).

157.    Domtar must visually inspect each pulping process condensate closed collection system, used to comply with 40 C.F.R. § 63.446(d), every thirty days, pursuant to 40 C.F.R. § 63.453(l)(1).

158.    Domtar did not conduct visual inspections at the Domtar Mill as required by 40 C.F.R. §§ 63.453(k)(1), (2), & (5) and (l)(1) for the following periods:

Civil Complaint                    Page 26 of 32

| Number | Inspection Date | Previous Inspection Date | Days Between Inspections | Days Over 30 Between Inspections |
|---|---|---|---|---|
| 1 | 6/29/16 | 5/26/2016 | 34 | 4 |
| 2 | 8/29/16 | 7/28/2016 | 32 | 2 |
| 3 | 10/25/16 | 9/19/2016 | 36 | 6 |
| 4 | 11/29/16 | 10/25/2016 | 35 | 5 |
| 5 | 3/28/17 | 2/20/2017 | 36 | 6 |
| 6 | 5/30/17 | 4/26/2017 | 34 | 4 |
| 7 | 7/28/17 | 6/26/2017 | 32 | 2 |
| 8 | 8/29/17 | 7/28/2017 | 32 | 2 |
| 9 | 9/29/17 | 8/29/2017 | 31 | 1 |
| 10 | 11/28/17 | 10/16/2017 | 43 | 13 |
| 11 | 1/30/18 | 12/28/2017 | 33 | 3 |
| 12 | 4/30/18 | 3/29/2018 | 32 | 2 |
| 13 | 7/31/18 | 6/28/2018 | 33 | 3 |
| 14 | 11/30/18 | 10/22/2018 | 39 | 9 |
| 15 | 12/31/18 | 11/30/2018 | 31 | 1 |
| 16 | 1/31/19 | 12/31/2018 | 31 | 1 |
| 17 | 10/22/2018 | 8/30/2018 | 53 | 23 |
| **Total** | | | | **87 days** |

159.    Domtar violated 40 C.F.R. § 63.453(k) and (*l*) by failing to perform timely visual inspections of each enclosure, closed-vent system, and condensate closed collection system every thirty days.

160.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and Ark. Code Ann. § 8-4-103(b), Domtar is liable to the United States and DEQ for injunctive relief and civil penalties for each day of each violation.

2.    **CLEAN AIR ACT CLAIM 3: Violation of NESHAP Subpart DDDDD: National Emission Standards for Hazardous Air Pollutants for Major Sources: Industrial, Commercial, and Institutional Boilers and Process Heaters**

161.    Plaintiffs reallege and incorporate by reference Paragraphs 1–17, 33–48, 81–109, 132–137, and 143 as if fully set forth herein.

Civil Complaint                    Page 27 of 32

162.    Domtar is the owner or operator of industrial boilers, as defined in 40 C.F.R. § 63.7575, that are located at the Domtar Mill.

163.    The No. 1 Power Boiler, No. 2 Power Boiler, and No. 3 Power Boiler at the Domtar Mill are existing boilers, as defined in the NESHAP regulations. 40 C.F.R. § 63.7575.

164.    The No. 1 Power Boiler, No. 2 Power Boiler, and No. 3 Power Boiler at the Domtar Mill are affected sources, as defined in the NESHAP regulations. 40 C.F.R. § 63.7490.

165.    Domtar was required to comply with NESHAP Subpart DDDDD no later than January 31, 2016. *See* 40 C.F.R. § 63.7495(b).

166.    Domtar must demonstrate compliance with work practice standards—this includes the submission of a Notification of Compliance Status, pursuant to 40 C.F.R. § 63.7530.

167.    Accordingly, Domtar must conduct initial performance tests and fuel analyses to establish the operating limits of its boilers and include this information in a Notification of Compliance Status. *See* 40 C.F.R. §§ 63.7530(a) and (f), 63.7545(e).

168.    Domtar was required to provide this documentation sixty days after the conclusion of its performance test for the Domtar Mill, in accordance with 40 C.F.R. § 63.7545 (e).

169.    Domtar submitted a package titled Notification of Compliance Status on March 24, 2016, for the Domtar Mill Power Boilers.

170.    The submission failed to include the following elements required by 40 C.F.R. § 63.7545(e)(2):

      a.    Domtar did not establish the maximum fuel input level for the pollutants mercury and chlorine required by 40 C.F.R. § 63.7530(b)(1) and (2);

      b.    Domtar failed to include the fuel analysis required by 40 C.F.R. § 63.7530(b); and

c.      Domtar failed to include example calculations for Equations 7 and 8, which would establish the maximum pollutant input load for mercury and chlorine with data provided from the fuel analysis, in accordance with 40 C.F.R. §§ 63.7530(b)(1)(iii) and (b)(2)(iii).

171.    Domtar did not provide the equations for Power Boilers No. 2 and 3 or the initial fuel analysis until May 26, 2021.

172.    As of the date this complaint was filed, Domtar has not provided a completed Notification of Compliance Status to demonstrate compliance with the emissions limits of Table 2 of NESHAP Subpart DDDDD.

173.    Because Domtar has not provided a complete and accurate Notification of Compliance Status, Domtar has not demonstrated initial and continuous compliance with the emissions limits of Table 2 for the Power Boilers.

174.    Without the submission of the Notification of Compliance Status, Domtar has not demonstrated that the Domtar Mill has been continuously complying with its operating limits for hydrochloric acid (which the chlorine input reflects) and mercury emissions.

175.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and Ark. Code Ann. § 8-4-103(b), Domtar is liable to the United States and DEQ for injunctive relief and civil penalties for each day of each violation.

## REQUEST FOR RELIEF

176.    For the violations asserted in Claims 1 through 3, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, Domtar is subject to injunctive relief, mitigation of excess emissions, and civil penalties of up to $124,426  per day for each violation occurring after November 2, 2015, where penalties are assessed on or after January 8, 2025.

Civil Complaint                    Page 29 of 32

177.    For the violations asserted in Claims 1 through 3, pursuant to Ark. Code Ann. § 8-4-103(b), Domtar is subject to injunctive relief, remedial measures, and civil penalties of up to $10,000 per day per violation occurring beginning January 12, 2009.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, based upon the allegations in Paragraphs 1–177 of this Complaint, the United States and DEQ request that this Court:

A.    Permanently enjoin Domtar from operating the Domtar Mill except in accordance with the CAA and all applicable federal regulations and applicable federally enforceable state regulations, as well as the AWAPCA and APC&EC Rules;

B.    Order Domtar to bring the Domtar Mill into compliance with the CAA statutory and regulatory requirements, as well as the AWAPCA and APC&EC Rules, set forth herein;

C.    Order Domtar to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the CAA and the AWAPCA alleged herein;

D.    Assess civil penalties against Domtar in favor of the United States for each violation of the CAA and assess civil penalties against Domtar in favor of DEQ for each violation of the AWAPCA and APC&EC Rules;

E.    Award Plaintiffs their costs of this action; and

F.    Grant such other relief as the Court deems just and proper.


Respectfully Submitted,


Civil Complaint                    Page 30 of 32

FOR THE UNITED STATES OF AMERICA:

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


_____/s/ Kiana Courtney_____
KIANA COURTNEY
FL Bar No. 1010206
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: 202-532-3316
Email: Kiana.Courtney@usdoj.gov


_____/s/ Candace L. Taylor_____
CANDACE L. TAYLOR
Bar No. 98083
Assistant United States Attorney
Western District of Arkansas
414 Parker Avenue
Fort Smith, AR 72901
Phone: 479-783-5125
Email: Candace.Taylor@usdoj.gov


OF COUNSEL:

ALEXANDREA ROLAND
Office of Regional Counsel
U.S. EPA, Region 6
1201 Elm Street
Dallas, TX 75202-2733
Email: Roland.Alexandrea@epa.gov


Civil Complaint                    Page 31 of 32

FOR THE ARKANSAS DEPARTMENT OF ENERGY& ENVIRONMENT, DIVISION OF ENVIRONMENTAL QUALITY:

     /s/ Mary Frances Easterly

MARY FRANCES EASTERLY
AR Bar 2023088
Attorney
Arkansas Department of Energy & Environment
5301 Northshore Drive
North Little Rock, AR 72118
501-682-0673
golly.easterly@arkansas.gov